UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Barry Vincent Ardolf,

Defendant.

Criminal No. 10-159 (DWF/FLN)

**REPORT AND RECOMMENDATION**

---

Timothy C. Rank for the Government.
Seamus R. Mahoney for Defendant.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on July 28, 2010 on Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stops, Arrests and Searches [#34] and Defendant's Motion to Suppress Confessions or Statements in the Nature of Confessions [#35]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Court received testimony from Special Agent Robert Cameron, Special Agent Eric Humbert, and Defendant Barry Vincent Ardolf.

The Government submitted two exhibits into evidence during the course of the hearing. Government Exhibit 1 is a search warrant and application for the Defendant's residence.

Government Exhibit 2 is a search warrant and application for the electronic data contained within items seized from Defendant's residence. For the reasons which follow, this Court recommends Defendant's motions be denied.

## I. BACKGROUND

### A. The June 23, 2010 Indictment and Two Related Search Warrants

On June 23, 2010, Defendant Barry Vincent Ardolf was indicted and charged with one count of Unauthorized Access to a Protected Computer in violation of 18 U.S.C. § 1030, two counts of Aggravated Identity Theft in violation of 18 U.S.C. § 1028A, one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B), one count of Transmission of Child Pornography in violation of 18 U.S.C. § 2252(a)(1), and one count of Threats to the President and Successors to the Presidency in violation of 18 U.S.C. § 871(a). (Indictment, Doc. No. 17.) The Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Stops, Arrests and Searches [#34] challenges one search warrant for the Defendant's Blaine, Minnesota residence. (Doc. No. 34; Gov't Exs. 1, 2.) Defendant contends that evidence seized pursuant to the search warrant should be suppressed because the warrants were issued without a sufficient showing of probable cause in the supporting affidavit. (Doc. Nos. 34, 43.) The Defendant argues that the warrant lacked probable cause because it was based on stale information. (Doc. No. 43.) The Defendant does not challenge the April 20, 2010 search warrant. (Doc. Nos. 34, 43.)

#### *1. The July 21, 2009 Search Warrant for Defendant's Residence and Vehicles (Gov't Ex. 1)*

The first search warrant was issued on July 21, 2009 for the Defendant's residence on Alamo Circle NE in Blaine, Minnesota and associated vehicles. (Gov't Ex. 1.) This warrant was

requested by FBI Special Agent Robert Cameron.  *Id.*   Signed by U.S. Magistrate Judge Jeffrey J. Keyes of the U.S. District Court for the District of Minnesota, the warrant authorized a search for property and things including:   Internet billing and use records, records or other items that evidence ownership or use of computer equipment around the premises, any visual depictions of minors engaged in sexually explicit conduct or correspondence related to the possession or transmission of minors engaged in sexually explicit conduct, any "hacking" programs, devices, or peripherals, including those utilized to compromise WEP encryption, any records pertaining to the transmission of communication containing any threat to injure persons, computer passwords and other data security devices designed to restrict access to or hide computer software, documentation or data, and computers and all related computer equipment, instruction, software, and storage devices. (*Id.* at Attach. B.)

Cameron's affidavit in support of the search warrant is 23 pages long and includes two short attachments.  (Gov't Ex. 1.)  The first two pages of the supporting affidavit describe Cameron's background in computers and computer-related offenses.  *Id.*  The third page states that the premises to be searched is the residence, garage, and vehicles located at the Defendant's residence in Blaine.  *Id.*  The fourth page and part of the fifth page contains a listing of the federal statutes investigators believe the Defendant has allegedly violated.  Pages five through nine contain background information and definitions regarding computers, computer equipment, the Internet, and email.

      i.     *The Defendant's Next-Door Neighbor Reports Alleged Email and Internet Impersonation and Harassment*

Beginning on page 10, the affidavit begins to detail a series of events beginning in February 2009 and ending in July 2009.  The affidavit states that the Defendant's next-door

neighbor - a lawyer at a large Minneapolis law firm - reported to the Anoka County Sheriff's Office on February 27, 2009 that he was the victim of harassment.

*a. The First Yahoo Email Address, Two Related Emails, and a MySpace Profile*

On February 22, 2009, a Yahoo email address using the Defendant's next-door neighbor's first and last name (*e.g.*, firstnamelastname@yahoo.com) was used to send emails to the lawyer's co-workers. The first email, sent on February 22, 2009 at 12:17 a.m. to a female co-worker, stated, "I was thinking of you on Valentines Day. I wouldn't mind at all if you wanted to sneak me a kiss when nobody is looking. Remember what Bill Clinton finally fessed up to? I want that from you!"

The second email contained attached images of child pornography. This email stated, "Check it out. New family pic. I was thinking you could appreciate these. Plausable [sic] deniability, right?" The second email was sent to another of the lawyer's co-workers on February 22, 2009 at 1:02 A.M. The two attached images contained a depiction of three nude prepubescent children. One image was described as "2 nude prepubescent males and 1 prepubescent female. The female has the penis of one of he males in her mouth and the other male's penis in her right hand. The ages of the subjects appear to be 9-12 years of age."

Additionally, a myspace.com profile page was created in the name of Defendant's next-door neighbor using the above-described Yahoo email address. It was last accessed by the account owner on February 22, 2009, and included the following text in the "About Me" section:

> I bet my co-worker that since I'm a lawyer and a darn great one that I could get away with putting up porn on my site here. I bet that all I have to do is say there is plausible deniability since anybody could have put this up on my site. Like someone hacked my page and added this porn without my knowledge. This is reasonable doubt. I'm a damn good lawyer and I can get away with doing anything! Lawyers rule the world. I'm part of such

> a big firm that I'll have unlimited resources to get me off scot free. Even though most of the people in my law office are ass holes I know they will support me.
>
> Who I'd like to meet:
>
> Any ladies looking for a good time. I'm married but my spouse bites big time. I'm looking for a new love of my life. I can afford to let her go and start new. After all I'm a lawyer and I'm rich!...

(Gov't Ex. 1 at Affidavit, p. 12.) The myspace.com profile also had an image attached that the affidavit states is part of a series of child pornography known as the "Sabban" series. The affidavit states that the children depicted in the photo have been identified by the FBI.

The two emails referenced above originated from the Internet Protocol (IP) address 71.34.6.6. This IP address is assigned to Qwest. A subpoena to Qwest confirmed in a March 4, 2009 return that the 71.34.6.6 IP address was assigned by Qwest to the Defendant's next-door neighbor.

Another subpoena to Yahoo revealed in a March 16, 2009 return that the Yahoo email address at issue was registered on November 18, 2008 at 7:03 p.m. CST from the IP address 65.116.187.190. This IP address is assigned to a Hennepin County library in Minnetonka, Minnesota. Yahoo reported a total of nine logins to the Yahoo email account, beginning with the first on November 18, 2008. There were six logins during February of 2009, two of which were on February 22, 2009 (the same date that the two above-described emails were sent to the Defendant's next-door neighbor's co-workers.) The final login was March 11, 2009.

The Defendant's next-door neighbor, when confronted with this information, continuously asserted that he did not have any connection with the messages. He stated that the Defendant was technically savvy and held deep resentments surrounding an August 3, 2008

incident. After this incident, the next-door neighbor filed a complaint against the Defendant with the Blaine Police Department. The complaint alleged that the Defendant had inappropriately touched and kissed the next-door neighbor's toddler on the mouth.

On March 6, 2009, Anoka County Sheriff's Office detectives conducted a wireless network survey in front of the next-door neighbor's house, which determined that his wireless network was encrypted with WEP encryption. The affiant stated that he knows through training and experience that automated tools for cracking WEP encryption have been available for over five years, and that he himself defeated WEP using a software called "aircrack" in less than 10 minutes in 2005.

*b. A Gmail Address and One Related Email*

On March 9, 2009, Defendant's next-door neighbor contacted law enforcement and advised that two of his co-workers had received an email message from a Gmail address on March 8, 2009. The email was sent in the name of female unknown to the Defendant's next-door neighbor or his co-workers. The email stated:

> Subject: I was at William Mitchell College of Law Friday, 3/6
> Body: Friday afternoon on 3/6 I was at William Mitchell College of Law. I approached [next-door neighbor] and we talked about his presentation. We ended the conversation in the parking lot where he made sexual advances and grabbed at my breasts. I slapped his face and took of yelling at him to leave me alone... If I see him here again I will call the police and I will press charges. [Female Signature]. Wayzata, MN.

The next-door neighbor's law firm investigated the allegations in the email but did not find any evidence to support the incident. The Anoka County Sheriff's Office sent a subpoena to Google for the Gmail address. In a March 17, 2009 response, Google stated the account was created on March 8, 2009 at 10:29 p.m. GMT from the Comcast IP address 76.113.145.37.

Seven minutes after 10:29 p.m., the Gmail account user logged out of the newly-created Gmail account from a different Comcast IP address, 66.41.129.111. Comcast responded to a subpoena for both of those IP addresses. Comcast stated that the 76.113.145.37 address belongs to a residence on Alamo Circle NE approximately 200 feet from the Defendant (one house away). Comcast further stated that the 66.41.129.111 address belongs to a residence across the street from Defendant's residence – approximately 100 feet away.

The affiant stated that it is highly unlikely that individuals from two different residences would be accessing the same Gmail account at the same time. Instead, the affiant stated it is likely that a third party living close to both residences was using the two Alamo Circle NE wireless networks without consent. The affiant stated that he knows through training and experience that wireless networks can be accessed from over a block away.

*c. The Second Yahoo Email Address and One Threatening Email*

On May 6, 2009, an email from a second Yahoo email address – named for both the Defendant's next-door neighbor and the next-door neighbor's wife -- was sent to several government officials. It was sent to vice.president@whitehouse.gov, info@timpawlenty.com, rep.tim.sanders@house.mn, a captain at the Blaine Police Department, and others. The email stated:

> Subject: This is a terrorist threat! Take this seriously.
> Body: This is a terrorist threat! Take this seriously. I hate the way people are spending money you don't have...I'm assigning myself to be judge jury and executioner... Don't bother trying to trace this e-mail. I'm a lawyer for one of the largest law firms in the metro area and I know you can't touch me...I'll kill you all one at a time...I swear to God I'm going to kill you! The first one of you will be dead by June 1.

(Gov't Ex. 1 at Affidavit, p. 17.)

*d. The "Packet Capture" Device*

Next, the affidavit states that the law firm where Defendant's next-door neighbor works hired a security consultant to investigate the emails sent to law firm staff. To this end, the security consultant installed a "packet capture" device on the next-door neighbor's home wireless network on March 14, 2009. The packet capture device allowed the consultant to collect and analyze all network activity. The device showed that the Defendant's next-door neighbor's WEP encryption key remained the same during the entire time the packet capture device was on the network.

Using the packet capture device, which generates a log, the consultant identified at least three devices on the network that could not be attributed to the next-door neighbor's family. The affidavit states that MAC addresses are linked to unique computer network interface cards. The following three MAC addresses were on the network but could not be attributed to the next-door neighbor's family: 1) 00:b0:8c:04:69:3e; 2) 00:1b:77:48:b5:08; and 3) 01:00:5e:00:00:16. The affiant reviewed the packet capture logs provided by the security consultant on July 15, 2009. The affiant identified extensive activity from the second MAC address on May 6, 2009 between 23:14 and 23:44. At 23:37 on that same night, May 6, 2009, the second MAC address (00:1b:77:48:b5:08) sent a series of packets through the next-door neighbor's wireless connection. The following is a portion of that packet transmission:

> ...Host: **errorpage.comcast.net**Connection:...
>
> ...portal.gt=%22%BARRY%...
>
> ...portal.em=%22%**BarryArdolf**%22; OAX=R8M

...src=http://www.**comcast.ne**t/js/global/header_c_...

The affiant states that through training and experience he knows that a computer will often send automated messages containing unique identifiers to an internet service provider (such as Comcast or Qwest.) The affiant states that this activity happens by default, without any user interaction. The affiant further states that the Defendant's next-door neighbor's service provider is Qwest, while the Defendant's service provider is Comcast. In response to an FBI subpoena, Comcast reported on June 19, 2009 that user identifiers for the Defendant's Comcast account included "BarryArdolf."

Also on May 6, 2009, the second MAC address (00:1b:77:48:b5:08) sent data to an IP address for Yahoo.com at 23:37. The following is a portion of the transmission:

> ...m="urn:yahoo:ymws"><message><to><email>vice.president@whitehouse.gov</email></to><to><email>rtowle@uschamber.com</email></to><to><email>rep.kate.knuth@house.mn</email></to><to><email>info@timpawlenty.com...</email></to><to><email>kfenner@ci.blaine.mn.us</email></to><from><name>...
> ...<text>This is a terrorist threat! Take this seriously.
> I hate the way people are spending money you don't have...I'm assigning myself to be judge jury and executioner... I...ll kill you all one at a time...I swear to God I'm going to kill you! The first one of you will be dead by June 1. ...</text><html>...

The affidavit states that this captured traffic is a perfect match, in content and time stamp, to the threatening email to government officials described above.

Based on the information in the affidavit, law enforcement executed the search warrant at Defendant's residence on July 21, 2009 at 8:00 p.m., seizing at least 15 computers, at least 12 hard drives, numerous CDs, DVDs and videotapes, some floppy disks, wireless adapters, network cards, various other computer-related items, and two pieces of mail addressed to the

Defendant's next-door neighbor.

*2. The April 20, 2010 Search Warrant for Information Within Items Seized from Defendant's Residence (Gov't Ex. 2)*

A second search warrant was issued on April 20, 2010 for computers and evidence seized from the Defendant's residence on July 21, 2009. (Gov't Ex. 2.) This warrant was also requested by FBI Special Agent Robert Cameron. *Id.* Signed by U.S. Magistrate Judge Susan R. Nelson of the U.S. District Court for the District of Minnesota, the warrant authorized a search for data contained within the evidence seized from Defendant's residence. *Id.* Neither the Defendant's motion to suppress evidence nor the Defendant's memorandum in support of the motion challenges the validity of the April 20, 2010 warrant.

**B. The Execution of the July 21, 2009 Search Warrant for Defendant's Residence and Defendant's Interviews with Law Enforcement Officers**

The Defendant's Motion to Suppress Confessions or Statements in the Nature of Confessions [#35] and the Defendant's supporting memorandum argues that the statements made by the Defendant on July 21, 2009 were elicited in violation of the Defendant's Fifth Amendment right against self-incrimination and should therefore be suppressed. Three witnesses testified at the July 28, 2010 hearing on his motions to suppress evidence.

*1. Testimony of Special Agent Robert Cameron of the FBI*

Special Agent Robert Cameron of the FBI testified at the hearing regarding the execution of the July 21, 2009 search warrant and his questioning of the Defendant during the execution of that search warrant. Cameron, who is assigned to the Minnesota Cyber Crimes Task Force, testified that he was part of the approximately 14-member law enforcement team that executed

the first search warrant at Defendant's residence on the evening of July 21, 2009.  At the time

that the warrant was executed, law enforcement did not have an arrest warrant for the Defendant

and were at the Defendant's residence solely to execute the search warrant.  Cameron testified

that each individual on the search warrant team was armed and in a tactical gear with marks

identifying the officers as government officials.

Cameron testified that he was not with the group of three or four agents who initially

encountered the Defendant in his backyard, but that Cameron first met and identified himself to

the Defendant when Defendant was escorted by law enforcement officers into Defendant's

garage.  Then, while in the garage, Cameron testified that he identified himself to the Defendant

as a law enforcement officer and that he gave the Defendant a copy of the search warrant.

Cameron testified that the Defendant did not have any questions about the warrant.  Cameron

further testified that the Defendant, while in the garage, was not in handcuffs, was not under

arrest, and had been told by Cameron that he was free to leave the premises.

Then, Cameron testified, the Defendant voluntarily unlocked the door to the house and

allowed law enforcement to enter the house.  Cameron testified that as soon as the team entered

the house, they did a search for individuals and weapons and "cleared the house."  Cameron

testified that clearing the premises to be searched is a standard practice to protect officer safety.

Cameron testified that once inside the house he asked the Defendant if the Defendant was willing

to answer some questions.  Cameron testified that the Defendant agreed to speak with him.

Cameron testified that he asked the Defendant where a good place would be to talk, and

that the Defendant indicated the kitchen would be a good place.  The Defendant and Cameron sat

down at the Defendant's kitchen table, and Cameron testified that he interviewed the Defendant

while seated at the kitchen table for approximately 45 minutes. Cameron testified that there was one other law enforcement officer at the table in the kitchen, FBI Special Agent Robert Blackmore. Cameron further testified that the other members of the team were searching the premises and were not observing Cameron and the Defendant during his interview of the Defendant. Cameron testified that the Defendant's house had an open floor plan, and that the kitchen was part of an open area of the house near the living room. He testified that during his questioning of the Defendant there were probably at least two or three other officers within 30 feet of the kitchen table, but that these officers were not within 30 feet of the table at one time.

During the interview, Cameron testified, the Defendant was free to leave and free to use the restroom. The Defendant was not restrained and was not under arrest. Cameron testified that the Defendant's minor daughter was also present in the house during the search. He testified that the Defendant's daughter was located in the living room "pretty close to them."

Cameron testified that during his interview with the Defendant, Cameron asked background questions about the Defendant's work and about the Defendant's knowledge of computers. Cameron testified that he asked the Defendant whether he had a background in computer networking and whether he knew the difference between two types of wireless encryption standards – WEP and WPA. He further testified that the Defendant stated that he did not know the difference between the two standards. Then, later, when members of the search team apprised Cameron that the Defendant possessed a shelf of books on computer networking and hacking, a list of MAC addresses with a WEP encryption key, and software on his computer designed to defeat wireless encryption, Cameron again asked the Defendant about his knowledge of computers. Cameron characterized the Defendant's answers as "brief and evasive." Cameron

testified that he asked the Defendant why there was a certificate that read "Certified Ethical Hacker" in the Defendant's bedroom, and that the Defendant responded that he could not remember. Also, when Cameron asked the Defendant why there was mail intended for the Defendant's next-door neighbor found under the Defendant's mattress, the Defendant replied that he did not know.

Cameron testified that his manner with the Defendant during the interview was not aggressive, and that he did not yell. However, Cameron testified that he challenged the Defendant with questions about the computer-related items found in the house. Cameron characterized the interview as "not productive."

At the end of Cameron's interview, Cameron explained to the Defendant that he did not have any more questions and that he would continue to search pursuant to the warrant. However, Cameron testified that he had previously been advised that two Secret Service agents wanted to speak with the Defendant, and Cameron relayed this information to the Defendant. Then, Cameron testified that the two Secret Service agents – Special Agent Eric Humbert and Special Agent Lawrence Propes – approached the Defendant and asked if he would speak with them. Cameron testified that the Defendant said he would speak with the Secret Service agents.

Cameron further testified that after the Secret Service agents sat down with the Defendant he left to participate in the search of the house. Cameron was not present during the Secret Service interview. However, after the Secret Service interview was done, Cameron testified that a member of the law enforcement team came to tell him that the interview was over. Cameron testified that he stopped his search and went to speak with the Defendant to explain that the Defendant could leave but could not come back until the search was over. Cameron

testified that he advised the Defendant that the search might take a long time because the team was imaging some of the computer memory from the multiple computers within the house and that the imaging process was very slow. Cameron testified that it was necessary to image some computers at the scene because some information (*e.g.*, passwords) can be lost if the computers are not imaged before they are disconnected. Cameron testified that it is standard practice to allow individuals to leave an area being searched but not to allow them to return while the search is still ongoing. Cameron testified that this is so because of fears that individuals may leave, retrieve weapons, and then come back and harm law enforcement officers.

Cameron testified that the Defendant did not ask to pick up his son at any time during his interview with Cameron. Cameron further testified that the only time the Defendant mentioned picking up his son was at the end of the Defendant' s interview with the Secret Service agents, when the Defendant told Cameron, “I am going to go pick up my son.” Cameron testified that as the Defendant was free to leave during both of his interviews, the Defendant could have gone to pick up his son at any time.

*2. Testimony of Special Agent Eric Humbert of the U.S. Secret Service*

Special Agent Eric Humbert of the Minneapolis Field Office of the United States Secret Service testified at the hearing regarding the execution of the July 21, 2009 search warrant and Humbert's questioning of the Defendant on July 21, 2009. Humbert testified that the Secret Service is a member of the Cyber Crimes Task Force and that the task force needed “additional bodies” to execute the search warrant at the Defendant's residence. Prior to the execution of the warrant, Humbert testified, he reviewed a copy of the warrant and attended a pre-execution

operations meeting.  Humbert testified that the law enforcement team had been advised that there

had been activity at the Defendant's residence in the past.  Therefore, he testified, the team was

concerned about the possibility of weapons or threats to officers during the execution of the

search warrant.

Humbert testified that he was initially assigned to guard the outer perimeter of the

Defendant's residence as the team first approached the residence.  Humbert testified that he was

at the front left of the house and noticed an individual standing in the rear of the house near a

fence, facing away from Humbert.  At this point, Humbert testified, members of the team were

knocking on the door of the residence.  Humbert left his position on the perimeter and assisted in

identifying the individual in the back of the residence.  This individual turned out to be the

Defendant.  Humbert testified that he was wearing a raid jacket with police markings when he

approached the Defendant.  Humbert further testified that he did not recall whether the officers

approached the Defendant with guns drawn, but did state that the team was ready for threats of

violence.  Humbert testified that he told the Defendant that law enforcement was at his residence

to conduct a search.  Humbert further testified that the Defendant agreed to go with law

enforcement to the front of the house.

After identifying the Defendant, Humbert and a few other members of law enforcement

walked with the Defendant to the front of the house.  Humbert testified that the Defendant

brought the team in through the garage.

After the law enforcement team was inside the house, Humbert testified, they conducted

an initial search for individuals and weapons.  Then, Humbert testified, the Defendant sat at the

kitchen table talking with Agent Cameron.  Humbert testified that he told Cameron that Humbert

wanted to talk to the Defendant after the Defendant was done talking with Cameron.

Humbert testified that the primary job of the U.S. Secret Service is to protect the President and Vice President of the United States, and further testified that the Secret Service investigates any true threats against the President and Vice President.  Humbert testified that although the case against the Defendant involved other alleged criminal activities, the Secret Service was present only to investigate threats to the Vice President of the United States.

Humbert testified that he was in the basement searching for items related to the July 21, 2009 warrant when someone told him that Cameron was finished speaking with the Defendant. Then, Humbert testified that he and fellow Secret Service Special Agent Lawrence Propes sat at the kitchen table with the Defendant.  Humbert testified that he told the Defendant that he was free to leave, and explained to the Defendant that he was not interested in the topics Cameron had questioned the Defendant about.  Instead, Humbert wanted to find out whether the Defendant was a threat to the Vice President of the United States.  Humbert testified that he read the entire threatening email referenced in the search warrant to the Defendant and then questioned the Defendant about the message.  Humbert testified that in response to his questions, the Defendant repeated "I don't know what to think" approximately 10 or 12 times. He further testified that the Defendant told him that the Defendant had voted for the President and the Vice President and was "pleased with them."  In response to questions about why the Defendant would send threats if he was pleased with them, Humbert testified the Defendant stated, "Maybe I was mad at my neighbor."  In general, Humbert testified that he would characterize the Defendant's responses to his questions as "evasive," and that the Defendant "wasn't saying too much."  Humbert testified that his manner while questioning the Defendant was non-combative,

and that he was not aggressive and did not raise his voice. Humbert testified that he estimated the interview with the Defendant lasted approximately 20 minutes. Humbert could not recall how many questions he asked. Humbert testified that he did not record the interview and further testified that it is standard practice not to record such interviews.

At the end of the interview, Humbert testified, the Defendant said he needed to pick up his juvenile son. Humbert testified that this was the only time Humbert heard the Defendant say anything about needing to leave to pick up the Defendant's son. Humbert testified that the Defendant was allowed to leave several minutes after the Defendant requested to leave to pick up his son.

Humbert could not recall whether, during the course of the interview, there were other officers milling about near the kitchen table. Humbert further testified that there were approximately 14 officers in the house during the interview.

*3. Testimony of Defendant Barry Vincent Ardolf*

The Defendant testified at the hearing. The Defendant testified that he was at the rear of his house working on his fence when he happened to glance at the street and saw what looked like official government cars. Then, he testified, he saw a mob officers running toward the house. He testified that all of the officers had their guns drawn. The Defendant testified that three agents, wearing vests, with guns drawn, approached him at the back of the house. He testified that the officers addressed him orally, telling him to "stay back" and that one officer said either "Are you Barry"? or "Are you Mr. Ardolf?" The Defendant testified that he identified himself as Barry Ardolf. At least one officer holstered his gun, and then a few of the officers guided him up to the front of the house. The Defendant testified that he was not

handcuffed but "they did put hands on me."  He described the officers' touch as similar to a husband putting his hand on his wife's back to "guide her."  The Defendant testified that he was "scared to death" and that he believed he had to go with the officers.

Once in the garage, the Defendant testified, he was patted down.  He testified that he did not recall whether he wanted to go in the house, but that he was certain he was under law enforcement's control and did not have a choice in the matter.  Once inside, the Defendant testified that the officers used "body motions" to indicate that he should sit at the kitchen table, and that in his opinion he was "escorted" to the kitchen table. He testified that he was not handcuffed and that the officers did not tell him that he was under arrest.  However, the Defendant testified that none of the officers informed him that he was free to leave at any time. He testified that the officers did ask him if he would speak to them, and that he did agree to speak with them. The Defendant further testified that speaking with the officers was "a voluntary thing."  He testified that although no one told him he had to speak with the officers,  he had been "brought up" to answer questions from law enforcement.

The Defendant testified that he answered truthfully when he stated to the officer interviewing him that he did not know the difference between WEP and WPA wireless encryption.  He testified that he self-educated on hacking.  He testified that he did have books on hacking and intrusion and did have a bumper sticker that reads "certified ethical hacker"on a mirror in his bedroom.  The Defendant further testified that there were framed certificates relating to computer repair, networking, etc. on the walls of his bedroom.

The Defendant testified that the night the search warrant was executed his son was attending a weekly function and that it was the Defendant's habit to always pick up his son after

the function concluded. The function ends at 9 p.m., the Defendant testified, and he estimated that it takes 20 minutes to drive to the pick-up location. The Defendant testified that he told the officers more than once during the course of his interviews that he needed to pick up his son. The first time, he testified, was at approximately 8:35 p.m. He testified that all of the officers on the search team looked the same to him, so he does not know to whom he was speaking at 8:35 p.m. When he asked to leave, the Defendant testified, the officers did not say he could leave. Instead, the Defendant testified that he was ignored, he was not told he could leave, and that the questions continued. He testified that “they pretty well crowded me and continued questioning me.” The Defendant testified that by “pretty well crowded me” he meant that there was one officer in front of him across the table, one to the left, one directly behind to the kitchen, and an officer guarding the front door. He testified that he would have had to go through multiple officers to get to the front exit of his house.

At approximately 8:45 p.m., the Defendant testified, he again asked the officers if he could leave to pick up his son. Once more, he testified, there was no direct response to his question. At this point, he was worried about being late to pick up his son. The Defendant further testified that at approximately 8:55 he again asked if he could leave to pick up his son and that, again, the questioning continued. He testified that he did not perceive that he could leave and that he was “getting very nervous.” The Defendant testified that he believed he was potentially not going to be able to pick up his son at all that night.

The Defendant testified that later, around 10 minutes after 9 p.m., he asked if he could call his son. This time, he testified, the officers did allow him to call his son. The Defendant testified that the officers stood up, stepped back, and allowed him to stand up from the table. He

testified that when he reached his son by phone he apologized for being late. The Defendant testified that around the time of the phone call "they did say I could leave," but that the officers did not let him leave right away. He testified that he got as far as the garage when he was halted again. The officers said that he could not leave right now. The Defendant testified that after about five minutes an officer handed him a restraining order and read the order to him. Only then, the Defendant testified, did the officers say he could go. However, he testified, the officers did say he was not allowed to come back while the search team was still on the property. The Defendant and his daughter then left to pick up the Defendant's son. The Defendant testified that after picking up his son he came back to his street twice and saw the police cars. He testified that he and his son and daughter stayed overnight in a hotel and came back to the property at approximately 8 a.m. the next morning.

## II. CONCLUSIONS OF LAW

### A. Probable Cause Determination

Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the magistrate with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.* at 239. A supporting affidavit that consists of conclusory allegations cannot support a finding of probable cause. *Id.* Veracity, reliability, and

basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S. 325, 328 (1990). Further, boilerplate language concerning previous investigations serves no purpose toward establishing probable cause and must be disregarded. *Ybarra v. Illinois*, 444 U.S. 85, 90 (1979) (search must be supported by probable cause particularized to defendant); *see also United States v. Weber*, 923 F.2d 1338, 1345-46 (9th Cir. 1991) (boilerplate statements "may have added fat to the affidavit, but certainly no muscle").

**1. The Affidavit in Support of the July 21, 2009 Search Warrant (Gov't Ex. 1) Sets Forth Facts Establishing Probable Cause To Believe Evidence of a Crime Would Be Found at Defendant's Residence**

The first issue is whether the July 21, 2009 search warrant application provided the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Gates*, 462 U.S. at 236-39 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."). The Defendant argues that the warrant lacks a sufficient showing of probable cause in the supporting affidavit because the only information sufficiently particularized to the Defendant is stale. (Doc. No. 43.)

There is no bright-line test for determining when information contained in a search warrant is stale. *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). However, "it is axiomatic by now that under the fourth amendment the probable cause upon which a valid search warrant must be based must exist at the time at which the warrant is issued, not at some earlier time." *United States v. Steeves*, 525 F.2d 33, 37 (8th Cir. 1975) (citing *Sgro v. United States*,

287 U.S. 206 (1932)). Probable cause to believe a search would uncover evidence of wrongdoing must exist at the time the officers seek to make the search; it is not enough that at some time in the past there existed circumstances that would have justified the search. *Id.* at 37-38.

Still, whether information in an affidavit is stale "depends on the particular circumstances of the case," and "cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *Koelling*, 992 F.2d at 822. "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." *Id.* Further, where continuing criminal activity is suspected, the passage of time is less significant. *United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996); *United States v. Rugh*, 968 F.2d 750, 754 (8th Cir. 1992) ("Where the affidavit recites facts indicating the presence of an ongoing, continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause.")(citing *United States v. Jones*, 801 F.2d 304, 314 (8th Cir.1986). In making a staleness determination, courts also consider whether the items sought in the warrant are likely to be destroyed or dissipated. *United States v. Horn*, 187 F. 3d 781, 786 (8th Cir. 1999.)

Here, the Defendant argues that the only information contained in the affidavit sufficiently particularized to the Defendant and his home was the information captured by the packet capture device on May 6, 2006 – the automated Comcast transmissions showing a connection to his next-door neighbor's wireless network and the threatening email. The Defendant further argues that this information was stale because the warrant was obtained 76 days after the packet capture device captured the transmissions. The FBI was first advised of the May 6, 2009 transmissions on June 28, 2009 and the affiant reviewed the information on July 15,

2009.  The warrant was executed on July 21, 2009.

In response, the Government argues that when conducting investigations related to computer and Internet use, 76 days is a relatively short delay because electronic data can be found on a computer even after files have been deleted and/or after a significant period of time has elapsed.  The Government further argues that the evidence in the affidavit provides a sufficient basis to believe that the Defendant engaged in a continuing pattern of criminal activity starting in November 2008 and continuing through at least May of 2009.  The Government contends that it is reasonable to believe that evidence of wrongdoing would be found on the Defendant's computer equipment even though the last documented use of his next-door neighbor's wireless network was 76 days prior to the execution of the search warrant.   The Court agrees.

The Court finds that the affidavit sufficiently sets forth evidence tending to show a continuous pattern of criminal activity involving electronic evidence from November of 2008 through May of 2009.  The Court further finds that as electronic information is often stored indefinitely on computers and that the evidence most particularized to the Defendant here (the two transmissions captured on May 6, 2009) is the type of electronic information unlikely to be destroyed within 76 days.  Moreover, the fact that some of the electronic information sought is information that is generally automatically transmitted without a computer user's knowledge makes it less likely that the Defendant would have deleted the data sought by the search warrant. The evidence tending to show a continuous pattern of criminal activity, taken together with the fact that the electronic information sought in the warrant was unlikely to have been destroyed within 76 days, supports the Court's conclusion that the information contained in the affidavit

was not stale.

For these reasons, the Court concludes that the officer's application for the July 21, 2009 warrant meets the requirements of the Fourth Amendment and is sufficient to support a finding of probable cause.

### B. The Defendant Was Not In Custody When Questioned by Law Enforcement and a *Miranda* Warning Was Not Required

#### 1. Custody Standard

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). The U.S. Supreme Court provided a two-part test for determining whether an interrogation occurs in custody in *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The court must inquire: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Moreover, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

In evaluating whether or not a suspect is in custody at the time of questioning, the Eighth Circuit has historically considered several "indicia of custody," which "tend to either mitigate or aggravate an atmosphere of custodial interrogation." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Factors to be considered in a custody evaluation may include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* Still, these indicia are not exhaustive and should not be applied ritualistically. *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005). Moreover, the Eighth Circuit has since called into question the *Griffin* factors, articulating that the "'most obvious and effective means of demonstrating that a suspect has not been taken into custody' [is] an express advisement that the suspect is not under arrest and that his participation in any questioning is voluntary." *Id.* (quoting *United States v. Czichray,* 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied* 125 S. Ct. 2514 (2005)). Notably, "[n]o governing precedent of the Supreme Court or the Eighth Circuit has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *United States v. Anaya*, 2010 WL 2196640, *7–8 (D. S.D. May 27, 2010), quoting *Brave Heart*, 397 F.3d at 1039; *see Czichray*, 378 F.3d at 826; *see also United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("An explicit assertion that the defendant may end the encounter generally removes any custodial trappings from the questioning.") (quotation omitted), *cert. denied*, 129 S. Ct. 2781 (2009).

The Defendant's Motion to Suppress Confessions or Statements in the Nature of Confessions [#35] argues that the statements made by the Defendant on July 21, 2009 were elicited in violation of the Defendant's Fifth Amendment right against self-incrimination and should be suppressed. The Defendant argues that the time, place, and character of his interviews

with law enforcement amount to a custodial interrogation and therefore required a *Miranda* warning.

In *Czichray*, the defendant was interviewed by two FBI agents at his home for nearly seven hours. 378 F.3d at 825.   He was informed several times that his participation was voluntary and that he was free to ask the agents to leave. *Id.*   During the interview, the defendant did not resist the questioning and never asked the agents to leave.  *Id.*  However, the defendant was instructed not to answer the telephone, was followed by an escorting agent when he visited his bedroom and the bathroom, and was told that the FBI would interview his 75-year-old father and would harm the defendant's business if the he did not cooperate. *Id.*  The agents did not threaten to arrest the defendant during the interview and he was not arrested until weeks later. *Id.* The court below expressly found that the agents informed the defendant several times that he could refuse to speak with them and could tell them to leave.  *Id.* at 826. On these facts, the Eighth Circuit observed:

> We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir.1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

*Id.*  The Court went on to state that the "weighty inference that Czichray was not in custody after receiving such advice is strengthened further" by the fact that the he was questioned in his home.

*Id.*  "When a person is questioned 'on his own turf' we have observed repeatedly that the

surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Id.* (citing *United States v. Helmel*, 769 F. 2d 1306, 1320 (8th Cir. 1985).).

Here, both Special Agent Cameron and Special Agent Humbert testified that the Defendant was repeatedly told before and during their interviews with the Defendant that he was free to leave at any time. It is uncontroverted that the Defendant was given a copy of the search warrant, was not in handcuffs or restrained in any way during the interviews, and was not told that he was under arrest. The Defendant was interviewed at the kitchen table in his home, not at a police station or other law enforcement site.

Both agents also testified that the Defendant never asked them for permission to leave to pick up his son until the conclusion of the Defendant's interview with Humbert. Both agents further testified that when the Defendant asked to leave to pick up his son, he was granted permission to do so and did in fact leave the premises. The Defendant, in contrast, testified that he repeatedly asked to leave to pick up his son and was ignored. The Court finds that the Defendant's testimony in this regard is not credible. The Court expressly finds that the Defendant was told that he was free to leave.

As in *Czichray*, the defendant here was questioned in his home absent formal arrest, voluntarily answered questions, was repeatedly told that he was free to leave, and freely did leave when the interview was done. Like *Czichray*, the Defendant here was not in custody and no *Miranda* warning was required. 378 F.3d at 825-26; *see Brave Heart*, 397 F.3d at 1039; *see also Elzahabi*, 557 F.3d at 884.

Even if the Defendant subjectively felt that he was not free to leave, the test for whether an individual is in custody is an objective test, not a subjective test. Under the objective test**,** the court must focus on how a “reasonable person in the subject’s situation would perceive his circumstances.” *Yarborough,* 541 U.S. at 662. The “determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.” *Stansbury,* 511 U.S. at 323. Taking an objective view of the circumstances of the Defendant’s interrogation, the Court finds that a reasonable person in the Defendant’s circumstances would have known that he was free to leave and was free to refuse to answer questions.

Defendant was not in custody when he spoke to officers on July 21, 2009. A *Miranda* warning was not required. The Defendant’s July 21, 2009 statements should not be suppressed.

## III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant’s Motion to Suppress Evidence Obtained as a Result of Illegal Stops, Arrests and Searches [#34] be **DENIED** and that Defendant’s Motion to Suppress Confessions or Statements in the Nature of Confessions [#35] be **DENIED**.

DATED: August 13, 2010

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 27, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party’s brief

within fourteen days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 27, 2010** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.