UNITED STATES DISTRICT COURT

DISTRICT COURT OF MINNESOTA

Cr. 10-159 (DWF/FLN)

-----------------------------------------------

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                          **DEFENDANT'S POSITION PAPER AS TO**
                                            **SENTENCING FACTORS**


BARRY VINCENT ARDOLF,

        Defendant.

-------------------------------------------------

## INTRODUCTION

The above defendant, by and through his undersigned stand-by counsel, submits this Position Paper, pursuant to 18 U.S.C. 3661 and U.S.S.G. 1B1.4, in order to address issues presented in his sentencing. This submission is made in order to provide the Court with "more information than is otherwise available to it as a basis for determining the sentence to be imposed". 18 U.S.C. 3552 (b).

Mr. Ardolf accepts responsibility for his acts of cyber-hacking directed at his neighbors. He apologizes to them for this actions, acknowledging the pain that he intentionally inflicted on them and stating, in no uncertain terms, that they are not in any way responsible for his actions. Mr. Ardolf breached their privacy in an attempt to ruin their careers, among other things by sending child pornography to an employer and threats to the vice-president, all the while attempting to make it appear that his neighbors were the source.

This issue before the Court involves fashioning a reasonable sentence for such unreasonable actions. Mr. Ardolf believes that a sentence pulled from a fair reading of the sentencing guidelines is a sufficient, but not greater than necessary, sentence to address the seriousness of his actions and to send a clear message that such behavior will meet serious consequences. A first time offender, with no criminal history, he respectfully proposes a sentence

1

of incarceration of 63-78 months, a sentence which would promote respect for the law, deter similar behavior, and achieve the sentencing factors of the sentencing statute, 18 U.S.C. 3553 (a).

## PRE-SENTENCE REPORT (PSR)

This PSR includes a number of enhancement which Mr. Ardolf feels would be inappropriately applied to him.

### Enhancement for Obstruction of Justice.

Mr. Ardolf objects to any enhancement for obstruction of justice because:(1) he did not "*willfully*" attempt to obstruct justice; and (2) he did not attempt to ***unlawfully influence a witness***. U.S.S.G. 3C1.1

The defendant wrote a November 10, 2010 letter to his son which was intercepted from his mail while incarcerated at the Sherburne County Jail.

The letter in question refers to the events of August 2, 2008, specifically the nature of the defendant's interaction with the minor child of his new neighbors. It was the belief of the neighbors that the defendant had kissed their minor child, an allegation the defendant denies. Upset at what they believed to have been inappropriate conduct by the defendant towards their young child, the neighbors called the police. This incident then became the catalyst for the defendant's criminal acts towards the neighbors. The incident led to acts of attempted revenge, culminating in the convictions on six counts of criminal conduct.

What is evident, however, is that the initial confrontation of August 2, 2008, is not an element of any of the six counts. What happened on that day is irrelevant to the acts of attempted revenge forming the counts of conviction. The nature of the exchange between Mr. Ardolf and his neighbors had nothing to do with subsequent criminal acts. The conduct of the defendant **after** August 2, 2008 is the basis for the criminal convictions for which the defendant will be sentenced. The letter in questions doesn't even refer to the initial incident between Mr. Ardolf and the minor child, but rather to the subsequent confrontation between Mr. Ardolf and the child's father.  As irrelevant acts, there is no basis to believe that the defendant's son would have been a witness at his trial, or at his sentencing.

Additionally, it bears noting that Mr. Ardolf did not instruct his son to say that he (the son) had seen the initial incident. To the contrary, Mr. Ardolf specifically states to his son: "*I don't know* if you watched {the neighbor} come over the next day, but *if* you did, keep to my

story" (my emphasis). Mr. Ardolf is not instructing his son to lie, that is, to say that he saw the confrontation. He is not asking his son to manufacture testimony, as he directly opens the possibility that his son did not see the confrontation, which as I said, is, in any event,  irrelevant to the crimes of conviction.

In an Eighth Circuit case, "the district court found that [the defendant] indirectly attempted to influence the recipient of [a] first letter not to testify at his sentencing hearing by sending her a post-plea letter in which he stated that upon his release he would sexually assault her minor daughter" and that this constituted obstruction of justice. The Eighth Circuit, however, reversed and found that,
"[a]fter a careful review of the record, we are left with the definite and firm conviction that the district court was mistaken in its determination that the letter was an attempt to obstruct justice. It seems to us that it is far more likely that the letters in question were actually a continuation of the illegal conduct for which [the defendant] was convicted. *In reaching this conclusion, we found it important that the letter did not refer, directly or indirectly, to testimony or even to any court proceeding.* It is relevant, too, that *we have discovered nothing in the record to indicate that [the defendant] believed that the victim might testify at his sentencing hearing*." United States v. Amsden, 213 F.3d 1014, 1015 (8th Cir. 2000) (my emphasis).

Other Eighth Circuit case law does not support an obstruction of justice enhancement in circumstances similar to those in Mr. Ardolf's case. The Eighth Circuit cases which have  upheld the enhancement for influencing or attempting to influence a witness have dealt with circumstances in which a defendant has threatened a witness, has caused or attempted to cause a witness to lie, or has caused or attempted to cause a witness to not testify against him or her. None of these occurred in this defendant's case.

The following cases are illustrative of when the Eighth Circuit has applied this enhancement for influencing or attempting to influence witnesses. Although these cases may not establish that other circumstances do not constitute obstruction of justice, they certainly illustrate the general tone and tenor of what it takes to constitute obstruction of justice by influencing or attempting to influence witnesses.

*United States v. Cunningham*, 593 F.3d 762 (8th Cir. 2010) (finding that obstruction of justice had occurred where the defendant ordered the destruction of evidence which was directly relevant to the pending investigation);

*United States v. Mueller*, 368 Fed. Appx. 709 (8th Cir. 2010) (finding that the obstruction enhancement was warranted where the defendant attacked an inmate who could have testified against him at sentencing);

*United States v. Larue*, 376 Fed. Appx. 645 (8th Cir. 2010) (obstruction appropriate where the drug dealer defendant instructed one of this customers to tell anyone who had any dealings with the defendant to get out of town)";

*Hall v. United States*, 46 F.3d 855, 859 (8th Cir.1995) (finding that, if the defendant "threatened the witness, the district court had no choice but to impose the sentence enhancement" for obstruction of justice);

*United States v. Capps*, 952 F.2d 1026, 1028-29 (8th Cir.1991) (finding that, although the threat was not communicated directly to the witness, the defendant's communication of a violent threat against a key government informant to a third-party sustained an enhancement for obstruction of justice);

*United States v. Carrillo*, 380 F.3d 411, 414 (8th Cir.2005) (finding that an assault of a co-defendant/witness and a threat of violence against the co-defendant's family during the attack constituted obstruction of justice);

*United States v. Davis*, 357 F.3d 726, 729 (8th Cir.2004) (finding that threats and acts of violence against potential witnesses constituted obstruction of justice), *rev'd on other grounds*, 543 U.S. 1099, 125 S.Ct. 1049, 160 L.Ed.2d 993 (2005);

*United States v. Drapeau*, 121 F.3d 344, 350-51 (8th Cir.1997) (finding that sending suggestive letters regarding a co-defendant's possible decision to testify and speaking with that co-defendant and threatening to assault another witness because the witness had cooperated with the government amounted to obstruction of justice);

*United States v. Grady*, 997 F.2d 421, 425 (8th Cir.), *cert. denied*, 510 U.S. 958, 114 S.Ct. 416, 126 L.Ed.2d 363 (1993) (finding that an enhancement for obstruction of justice was appropriate because the defendant "and others under his control threatened a government witness");

*United States v. Larson*, 978 F.2d 1021, 1025-26 (8th Cir.1992) (finding that "[t]he solicitation of false testimony generally may be viewed as an obstruction of justice" and that a letter the defendant wrote to a friend from jail asking his friend to manufacture testimony amounted to obstruction of justice);

*United States v. Mugan*, 441 F.3d 622, 632 (8th Cir.2006) (finding that the defendant's sending letters to his wife and other family members soliciting false and exculpatory testimony amounted to obstruction of justice);

*United States v. Noland*, 960 F.2d 1384, 1391 (8th Cir.1992) (finding that the defendant's eliciting false testimony from her two minor children was obstruction of justice);

*United States v. Nunn*, 940 F.2d 1128, 1133 (8th Cir.1991) (finding a telephone threat made to a potential witness constituted obstruction of justice); and

As a final point, Mr. Ardolf did not make his statements to his son with the intent or purpose of obstructing justice. *See United States v. Thomas-Hamilton*, 907 F.2d 282, 285-86 (2nd Cir.1990) ("the word 'willfully,' as used in section 3C1.1, requires that the defendant consciously act with the *purpose* of obstructing justice"), *United States v. Belletiere*, 971 F.2d 961 (3rd Cir.1992) (same), *United States v. Chavarria*, 377 F.3d 475 (5th Cir.2004), *rev'd on other grounds*, 543 U.S. 1111, 125 S.Ct. 1055, 160 L.Ed.2d 1044 (2005) (same), *United States v. Barnett*, 939 F.2d 405 (7th Cir.1991) (same) and *United States v. Gardner*, 988 F.2d 82 (9th Cir.1993)

Mr. Ardolf's communication to his son does not rise to a level of obstruction and as such, Mr. Ardolf objects to the  2-level enhancement for obstruction of justice under U.S.S.G. 3C1.1 .

### U.S.S.G. 3E1.1  Acceptance of Responsibility

Mr. Ardolf has submitted a statement to the United States Probation Office in which he "clearly demonstrates acceptance of responsibility" as required under U.S.S.G. 3E1.1. A copy of that statement is attached to this submission.   As the government was required to expend resources in preparation for, and in carrying out two days of actual trial, the requested reduction in the offense level is capped at two levels.

The PSR cites three reasons for recommending denial of the two level reduction: 1) the absence of a statement from Mr. Ardolf in which he acknowledges his criminal acts and expresses remorse for them; 2) Mr. Ardolf's violation of the terms and conditions of his pre-trial

release; and 3) Mr. Ardolf's supposed engagement in obstruction of justice by writing the above letter to his son. (PSR#54) Addressing these three  concerns in order, I began with Mr. Ardolf's written statement of acceptance.

1) The written submission by Mr. Ardolf evidences the  insight and contrition he feels. He submits this statement as a sincere expression of the recognition that he engaged is a series of acts of attempted revenge with no justification. He understands that his behavior has no place in a civilized society and accepts the fact that he will spend his next years in a federal prison, away from his teen-aged children. He offers the statement as a means of achieving closure. Mr. Ardolf, in admitting the evil of his conduct, owns up to his own behavior. He buys his mistakes, they are things that he owns, things that he must accept and for which he must ask  God's forgiveness.

Mr. Ardolf forced the government to prepare for trial and actually expend government resources in two days of trial and testimony. The timing of acceptance of responsibility is addressed in the  sentencing guidelines. "This adjustment is not intended to apply to a defendant who puts the government to it burden of proof at trial by denying the factual elements of guilt, *is convicted*, and only then admits guilt and expresses remorse". U.S.S.G. 3E1.1 Application Note 2. (my emphasis).

"Entry of a plea of guilty *prior to the commencement of trial* combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct… will constitute significant evidence of acceptance of responsibility  for the purposes of subsection (a)" U.S.S.G. 3E1.1 Application Note 3. (my emphasis).

Mr. Ardolf falls in the middle of these two scenarios, having pleaded guilty after the commencement of trial, but obviously prior to any conviction. He requests a two level reduction from the Court, mindful of the Court's powerful discretion in this matter. "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review". U.S.S.G. 3E1.1 Application Note 2.

While a guilty plea does not guarantee a sentencing reduction for acceptance of responsibility, *United States v. Raplinger,* 555 F. 3d  687 (8th Cir. 2010), a guilty plea, coupled with a sincere admission of wrong doing, can mitigate for a reduction.

"2) The revocation of Mr. Ardolf's pre-trial release is not grounds for denial of the two level reduction for acceptance of responsibility. Mr. Ardolf was taken into custody on July 9, 2010 for having possessed a computer in violation of the terms of his pre-trial release order. Obviously his November 1, 2010 letter, the basis of the government's request for an enhancement for obstruction of justice, can  not be seen as a factor in the July 9, 2010 recession of supervised release.

"Conduct resulting in an enhancement  under 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal acts". U.S.S.G. 3E1.1 Application Note 4. There is no basis for the proposition that the violation of the pre-trial release order in any way constitutes obstruction of justice. A non-exhaustive list of examples of conduct constituting obstruction of justice is found at U.S.S.G. 3C1.1 Application Note 4. Violation of conditions of pre-trial release is not found among the eleven examples of obstruction cited in the Application Note.

Having violated the terms of his pre-trial release, Mr. Ardolf has had to spend almost eleven months in the Sherburne County Jail, as opposed to being home with his two teen-aged children. There is no legal basis for further punishment.

3) As stated above, Mr. Ardolf does not believe that the letter written to his teenage son constitutes obstruction of justice. As such, it can not serve as a basis to deny him a two level reduction in the offense level for acceptance of responsibility under U.S.S.G. 3E1.1.

**Two level enhancement under U.S.S.G. 2G2.2 (b) (7) (A) Number of Images**

Objection to made to the enhancement on the grounds that there not ten pornographic images involved in the offense.  Application Note 4 to U.S.S.G. 2G2.2 provides guidance on how to determine the number of images. "For purposes of determining the number of images under subsection (b) (7): (i) Each photograph, picture, computer or computer generated image, or any similar *visual* depiction shall be considered to be one image" (my emphasis).

There was only one child pornographic photograph used in the offense, depicting a girl and two boys, as  described in PSR#25. A second photograph was sent by Mr. Ardolf, though the age of the young woman in the picture, can not be established. (PSR#25) These photographs were both sent to the neighbor's work place, obstensibly from him, as an act of Mr. Ardolf's attempted revenge. The known child pornography photograph was also posted on a

Myspace.com page under the neighbor's name. As such there were two copies of the same image, involved in the offense of distribution as codified in 18 U.S.C. 2252 (a) (1).

On execution of the July 21, 2009 search warrant of the defendant's house, numerous computers, hard drives, CD's, and thumbnail drives were seized. Referring to the photograph of the girl and two boys, which is the only photograph depicting child pornography, the preliminary pre-sentence report at #25 states: "Eight files depicting the complete image or the altered image, which was posted on the Myspace.com page, were found during the search warrant on various computer equipment and hard drives".

In recommending the two level enhancement under U.S.S.G. 2G2. (b) (7), the preliminary pre-sentence report states at paragraph #71: "In this offense, the defendant **possessed** eight copies of an image portraying child pornography. In addition, two images were involved when **transmitted** via e-mail message and uploaded to Myspace.com".

*First objection.*

The Assistant United Attorney by his response to the preliminary pre-sentence report, correctly noted that Mr. Ardolf was convicted in Count 5 of transmission of child pornography under 18 U.S.C. 2252 (a) (1). The importance of that correction is that it sets the base offense at 22. The preliminary pre-sentence report had placed the base offense level at 18, which corresponds to Count 4, involving possession of child pornography.

Under U.S.S.G. 3D1.2, "all counts involving substantially the same harm shall be grouped together into a single group". The child pornography that was possessed, i.e. the eight files allegedly contained the images, and the two images that were transmitted, are clearly part of the same harm. Counts involving the same harm are to be grouped where:

    (a) When the counts involve the same victim and same act or transaction,

    (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common plan or scheme" U.S.S.G. 3D1.2

Counts 4 and 5 should clearly be grouped. As such, the highest offense level of the counts in the group is used. Application Note 2 to U.S.S.G. 3D1.3. For this reason, it is correct to use base offense level 22, pertaining to distribution of child pornography.

The objection to the use of U.S.S.G. 2G2. (b) (7), to enhance that base offense level is firstly that there were two images involved in the offense of Count 4, the image was sent via e-

mail and that which was  posted on Myspace.com. The other alleged images, those supposedly found on some of the eight hard drives, was computer language, through forensic specialists were able to  determine, through a law enforcement computer program, that the image has previously been present on the computer.   In other words, the image was not present, rather there was the indication that the image had previously been present. There is no indication that these images were involved in the offense of Count 4, transmission of child pornography. Where there only two images involved in the offense, no enhancement under U.S.S.G. 2G2. (b) (7), is warranted. The offense which drives the sentencing guideline calculation is the distribution of child pornography and there are only two images involved.

**Second Objection**

a) Some  images, though less than eight,  were found in the hard drives and other storage devices pursuant to the July 21, 2009 search warrant of the Ardolf residence. Other hard drives and storage devices did not contain the image in question. Rather, the government expert was able to identify, through a law enforcement computer program , that the image had once been on the file and had been erased.  There is no indication that those images, which had once been on the file, had ever been transmitted, and there is certainly no possibility that once erased, that they had the potential to be transmitted. The question presented here is two-fold, whether multiple versions of the same version, are each independent images for purposes of  U.S.S.G. 2G2.2 (b) (7) and secondly can an erased image be considered an independent  image for the purposes of U.S.S.G. 2G2.2 (b) (7).

The Eighth Circuit addressed the first aspect of this question in *U.S. v. Sampson*, 606 F. 3d 505 (8th Cir. 2010) It is clear from a reading of *Sampson* that where multiple versions of the same are **distributed**, each image distributed is counted. The holding in *Sampson* is that where the same video was e-mailed twice, that two images are counted. In Mr. Ardolf's case, that would bring his countable images to two, the image sent by e-mail and the one posted on Myspace.

However, under *Sampson*, the images found pursuant to the July 21, 2009 search warrant, even those which were still intact, would not be added to the count, because they were not transmitted.

In the case of *Sampson*, the Eight Circuit, a case of first impression, the Court acknowledged "a dearth of case law discussing the issue" (*Sampson* at 509). It then  decided that

where the same image is re-transmitted, that each transmission counts as an image. In *Sampson* the Court was dealing with videos, for which a count of 75 images is  imputed for each video. The Court found the two transmissions to count for 150 images.

The Court distinquished defendant *Sampson* from the defendant in *United States v. Goff*, 501 F. 3d 250 (3rd Cir. 2007), which had ruled in dicta that duplicate images are not countable. (*Sampson* at 509). "Although the Third Circuit has observed in dicta that duplicate images are not to be counted under U.S.S.G. 2G2.4 (b) (5), the predecessor to 2G2.2(b) (7), it did so without analysis and in the *context of a child pornography possession case*". (Id at 509) (my emphasis)

The Eighth Circuit also distinguished defendant *Sampson* from the defendant in United *States v. Lacey*, 569 F. 3d 319 (7th Cir. 2007) where the Seventh Circuit also excluded duplicate issues from the 2G2.2(b) (7) counting because the images were not distributed.

What was important for the Court in *Sampson* was the fact that images were distributed. The Court relied heavily on a decision of the D.C. Circuit, *United States v. Sullivan*, 451 F. 3d 884 (D.C. Cir. 2006) and noted the "significance of the distinction between **possession of multiple copies** of an image of child pornography **and distribution of multiple copies** of such an image". (*Sampson* at 509) (my emphasis).

Emphasizing the "viral" nature of digital forms of child pornography, and concerned with the exponential increase in the victimization of the children by repeated exploitation by distribution of duplicate images, the Court stated: "that concern is just as clearly implicated by a duplicate image as it is an original" (*Sampson* at 510). The concern of repeated victimization by multiple transmissions was behind the Court's holding: "We conclude that 2G2 (b) (7) means what a plain reading of it application note indicates: '*Each* video' and '*[e]ach* photograph' which a defendant distributes in to be counted under 2G2.2(b)(7), regardless of whether or not it is a duplicate". (id at 510).

As applied to Mr. Ardolf, case law holds that the two images that were distributed are to be counted, the eight or so other images found during the search warrant which were not distributed are not to be counted.

With respect to the *second objection*, the second half of the issue remains. Some  of the evidence of the existence of the image on other hard drives and storage devices comes, not from the presence of the image itself, but from forensic examination, which  establishes that the image was once present, but since deleted. Under *Sampson*, these erased images should not count, not

only as not having been distributed, but also in light of the fact that no distribution of an erased image is even possible. The Court's concern with the 'viral nature' of child pornography, the potential for continued exponential exploitation of the children, does not come into play where images are, not only have not been distributed, but are  no longer available for distribution.

To make a medical analogy from the *Sampson* holding.  Child pornography images are like cancer cells that can virulently spread. As they spread,  damage is increasingly caused. For that reason, each transmitted image, each cancerous cell, is individually counted. Deleting an image is like medically removing cancer cells. What is left is a scar, medical evidence of the presence of cancerous cells, or, in the case of computers, what is left is evidence, obtained from law enforcement forensic software, that indicates an image had once been there. What is no longer present is the cancerous cell, or the potentially virulent child pornography image.

For these reasons,  Mr. Ardolf disputes that there were ten or more images involved in the offense and objects to the two level enhancement under U.S.S.G. 2G2.2 (b) (7).

### Four level enhancement under U.S.S.G. 2G.2.2 (4) Nature of the image

"If the offense involves material that portrays sadistic or masochistic conduct or *other* depictions of violence, increase by four levels". U.S.S.G. 2G2.2 (4) (my emphasis). The preliminary pre-sentence report recommends the application of this enhancement. The defendant objects. As the emphasized text indicates, "sadistic or masochistic conduct" inherently involves violence. However  reproachful  the use of the image of the girl and two boys, the image does not fit within the definition of 'sadistic, masochistic, or other depictions of violence'. Not all child pornography is sadistic or masochistic, however reprehensible it may be.

Application Note 2 to U.S.S.G. 2G.2 (b) (4) addresses the application of the enhancement. "Subsection (b) (4) applies if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence".

A fair interpretation of the image in question is that is not violent or masochistic. The question that remains is whether it is sadistic. As to a definition of sadism, the Eighth Circuit has stated: "We have defined the term 'sadism' as the infliction of pain on a love object to obtain sexual release, as delight in physical or mental cruelty". *United States v. Diaz*, 368 F. 3d 991, at 992 (8th Cir. 2004)

Courts have described specific conduct in concluding  it to be sadistic.

"Sexual penetration of a minor female by an adult male is per se sadistic". *United States v. Johnson*, 450 F. 3d 831, at 834 (8th Cir. 2006);

"Enhancement affirmed where photograph showed 'sexual penetration by a minor girl upon herself …, forced oral sex, an adult male ejaculating into the face and open mouth of a crying baby, and adult males standing over and urinating in the face of a female child". *United States v. Parker*, 267 F. 3d 839, at 847 (8th Cir. 2001);

The Second Circuit in *United States v. Freeman*, 578 F. 3d 142, cited in *United States v. Hotaling*, 63 F. 3d 725 (2nd Cir. 2011)  provides a more thorough analysis.

1) The determination of whether an image is sadistic under 2G2.2 (b) (4) is an objective one.

2) If the sentencing Court finds that an image depicts sexual activity involving a minor and depicted image would have caused pain in the minor, no further findings are needed to impose the enchancement.

In *Hotaling*, "the minor was partially nude, handcuffed, shackled, wearing a collar and a leash and tied to a drawer".  (id at 731)

"Not only does this image portray the minor in a situation that would have caused at least some level of pain, it meets the broader definition of 'sadistic conduct' because it portrays a situation that involves physical and mental cruelty, here in the form of forcible restraint" (id at 731, 732)

Not all sexual activity is sadistic in nature. From the case law, there is guidance as to what is sadism.

- Sexual activity between an adult and minor
- Sexual activity involving pain
- Sexual activity involving physical or mental cruelty, as depicted in *Hotaling* by forced restraint.

The dictionary definition of sadism is: 1) "the getting of sexual pleasure from dominating, mistreating, or hurting one's partner". 2) "the getting of pleasure from inflicting physical or psychological pain on another or others". *Webster's New World Dictionary*, Simon and Schuster.

As applied to the image in the present case, it should be remembered that there is an objective standard. It is not akin the statement on pornography:"I know it when I see it". There

12

are elements that must be present. A non-exhaustive list would include adult on child, pain, restraint, cruelty, paraphernalia associated with restraint or pain, and  demeaning situations evincing dominance.

The enhancement under U.S.S.G. 2G.2 (b) (4) is not appropriate to the image associated with Mr. Ardolf's offense under the objective standard urged by the Second Circuit in *Freeman*.

**U.S.S.G. 3B1.3 Use of Special Skill**

Mr. Ardolf objects to the two level enhancement recommended in the preliminary pre-sentence report is that no special skills were used to facilitate the commission or concealment of the offense. Application note 4 to U.S.S.G. 3 1.3 defines 'special skill' as "a skill not possessed by member of the general public and usually requiring substantial education, training, or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists and demotion experts". Mr. Ardolf is clearly not a member of any of those professions. The preliminary presentence report at paragraphs #124-#126 lays out his educational background. He has no special education or  licensing.

Not only must a  defendant possess a special skill, but that special skill must have been used to facilitate the commission of the offense.. The low level of encryption protection on the neighbor's wireless router, made it possible to easily hack into their router and hence their internet connection. The level of encryption on the neighbor's computer used the WEP, a first generation encryption standard, recognized as being  extremely low. With a software program and a brief tutorial anyone, an unsophisticated computer user, within radio rage, could have compromised its security.  Given the outdated encryption used on the wireless router that Mr. Ardolf  hacked into, it required no special skill to do so.

Mr. Ardolf does not attempt to lay blame on the neighbors, nor does he deny his own criminal acts. He rather objects to the enhancement on the grounds that special skills were not needed to intrude into a network connection through a router with an encryption that is recognized as substandard. It does not require special skills to access a wireless router protected with a WEP encryption.

**18 U.S.C. 1028A Aggravated Identity Theft**

Mr. Ardolf objects to the recommendation for any additional terms of imprisonment of 24 months for his convictions for Counts 2 and 3, violations of 18 U.S.C. 1028A on the grounds that there is no statutory basis for the additional terms of incarceration.

18 U.S.C. 1028A states: "Whoever, during and in relation to any *felony violation enumerated in subsection (c),* knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person, shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."

Subsection (c) Definition: "For purposes of this section, the term 'felony violation enumerated in subsection (c) means any offense that is a felony violation of – (numerous felonies are listed).

In support of the additional terms of consecutive imprisonment, the United States Probation Office apparently  relies on 18 U.S.C. 1028A (c) (4) because the PSR at Area of Controversy paragraph 6, states:

"The defendant was convicted of Unauthorized Access to a Protected Computer, a violation of 18 U.S.C. 1030 (a) (2), which is listed in 18 U.S.C. 1028A(c) because it is a provision named in the same chapter.

18 U.S.C. 1028A (c) (4) states: "any provision contained in this chapter **(relating to fraud and false statements)** other that this section or section 1028 (a) (7)" (my emphasis).

The use of 18 U.S.C. 1028A (c) (4) as a predicate offense for the two year consecutive sentences is inappropriate because of the absence of fraud or false statements as an element in the  18 U.S.C. 1030 (a) (2), Count 1 of the  offenses for which Mr. Ardolf was convicted.

The date of the commission of Count 1 is February 22, 2009, the date that first e-mail messages were sent to the neighbor's employer.(PSR #9, #10, #11). 18 U.S.C. 1030 (a) (2), which forms Count 1 of Mr. Ardolf's indictment, states Whoever-

"intentionally accesses a computer without authorization of exceeds authorized access, and thereby obtains-

      A. Information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602 (n) of title 15, or contained in a file of a

consumer reporting agency on a consumer, as such terms are defined the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

B.   Information from any department or agency of the United States; or

C.   Information from any protected computer if the conduct involved an interstate or foreign communication.

Use of this statute as a predicate  provision for 18 U.S.C. 1028A is clearly inappropriate as there is no fraud, or false statement included as an element of the offense. Further, while Mr. Ardolf pleaded guilty to Count 1, it is difficult to see how the acts occurring on February 22, 2009, as laid out in paragraphs #9, #10, and #11, constitute violations of 18 U.S.C. 1030 (a) (2). Mr. Ardolf accessed a wireless router, not a protected computer, defined in 18 U.S.C. 1030 (e) (2). He accessed the router to send potentially damaging e-mails to his neighbor's work colleagues on February 22, 2009. He didn't obtain any financial information of a financial institution or a card issuer. He didn't obtain information contained in a file of a consumer reporting agency. No information was obtained from an agency or department of the United States. He didn't obtain information from a protected computer.

For purposes of calculating his sentence under the sentencing guidelines, the most salient argument that Mr. Ardolf makes is that there is no fraud or false statement inherent in the elements of 18 U.S.C. 1030 (a) (2).

### Calculation under the Sentencing Guidelines

Mr. Ardolf has no prior criminal history, and is properly designated in criminal history category I. Under U.S.S.G. 3D1.4, the offense level is determined by taking the Group with the highest offense level. That offense level is driven by Count 5, with the highest offense level.

1) The base offense level is 22. U.S.S.G. 2G2.2 (a) (2) **(22)**

2) Two level enhancement for depiction of a prepubescent minor. 2G2.2 (b) (2) **(24)**

3) Two level enhancement for distribution, 2G2.2(b) (3) (F) **(26)**

4) Two level enhancement for use of a computer. 2G2.2 (b) (6) **(28)**

5) Two level reduction for acceptance of responsibility, 3E1.1 **(26)**

The corresponding guidelines for a Criminal History I and adjusted offense level 26 is 63-78 months of incarceration.

**Grouping**

The defendant does not agree with the PSR's recommendation for a 1 level increase under the grouping rules of U.S.S.G. 3D1.2 through U.S.S.G. 3D 1.4.

Under 3D1.2, "counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

Under this rule, the counts of conviction should be grouped together as there was a common victim from Mr. Ardolf's behavior comprising the six counts of conviction.

Under 3D 1.4., the "combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table". The table that follows that language assigns no increase in the offense level when there is a single number of units.

In the present case, there is only Unit to be counted.

"in determining the number of Units for purposes of this section:

(a) Count as on Unit the group with the highest offense level.

As there is only one Group, there is also only one Unit and under 3D 1.4, there is no increase in the offense level.


**Departure or Variance**

Given the nature of his offense, Mr. Ardolf will not request a downward variance from this guideline range and feels that the  guideline sentence he urges will  yield a sentence which is sufficient, but not greater than necessary to   comply with the statutory mandates of 18 U.S.C. 3553 (a). This case falls within the heartland of the cases contemplated by Sentencing Commission in the sentencing guidelines. This case involved bizarre behavior intended to harm the professional lives of  neighbors. The attempt to harm was unsuccessful, but constituted violations of federal law, implicating various section of the federal sentencing guidelines. The guideline sentence is driven in great part having sent child pornography in an act of revenge. The Court is well aware that the guideline calculation for child pornography lead to significant terms of incarceration. No upward departure from the guidelines calculation is needed in order to fashion the appropriate sentence, one which is substantial, but not greater than necessary to meet the sentencing factors of 18 U.S.C. 3553.

## REASONABLE SENTENCE

As the Supreme Court has stated: "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider each convicted person as an individual and each case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996)

Apart from the 2003 incident involving Mr. Ardolf' older daughter, he had no contact with law enforcement until the offenses which bring him before the Court for sentencing. Mr. Ardolf's criminal behavior began when he was forty three years old. By the accounts of his family members contained in the PSR at paragraphs #109-#114, he has many good qualities to go along with character flaws. The Court has received letters from his younger daughter, father, sister, and a close friend which accent the good in Mr. Ardolf.  In addition, the Court is being provided a second letter from Mr. Ardolf's younger daughter.[1] These letters speak to the positive qualities within Mr. Ardolf, as well as the love that these two children have for him. These two children are living together without a parent, trying a raise themselves as best they can. They clearly love their father.

The photographs that are being sent to the Court and the parties are pictures of the Ardolf family. The younger two children still reside at the Blaine home, being forced to become adults very quickly.

Two long term friends also have written letters on Mr. Ardolf's behalf. These letters stand in contrast to any characterization of him as an inherently evil person. He, rather, presents himself as a hard working man who has had a lot on his plate, especially during the past several years. He has handled the life a single parent fairly well. No doubt, Mr. Ardolf  has flaws in his personality, flaws which certainly led to the attempts to get back at his neighbor for what Mr. Ardolf perceived as personal affronts. By so doing, Mr. Ardolf's unique personal failings have brought him before this Court for sentencing. A guideline sentence, as calculated above, would be consistent with the goals of the sentencing statute in light of the nature and circumstances of the offense and the history and characteristics of Mr. Ardolf.

---

[1] These and other letters, along with family photographs, are being sent to the Court and the parties. They will not be filed with Clerk.

## HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Ardolf was born the third of three children, growing up in Wayzata. As a child, his mother was a stay at home mom, while his father worked as a pipe-fitter, a physically demanding job. While his parents divorced when he was six years old, Mr. Ardolf has no recollection of them ever fighting. He recalls his father as a strict disciplinarian, one who would not tolerate elbows on the table or other examples of perceived laziness.

Following their parents' divorce, the children's home life went from that of living with strict discipline to one of minimal parental supervision. Their mother was awarded full custody, and had to work full time. Mr. Ardolf recalls having few close friends, though was hardly a loner. He would ride his bicycle and go boating when invited.

An area of concern was his school performance. Perhaps the absence of his father was one cause of that  poor school performance. Mr.Ardolf believes that had his father been in the home, that he would have laid down the law about studying, sending him to his room to study on receiving poor grades. In any event, Mr. Ardolf dropped out of high school and at age 18 moved into his own apartment.

Moving into his apartment, he fixed his eyes on a young woman who was also living in the building. Their friendship developed into a steady relationship and two years after they met, they were married, Mr. Ardolf at 20 years of age, his wife three years older. Their wedding was held in his wife's family church with all of the families present.  The newlyweds moved to an apartment in Crystal.

 Having a slightly older wife was a godsend for Mr. Ardolf, as she encouraged him to continue his education. She said: "what do you mean you don't have a high school degree. Go get your GED". After getting that GED, Mr. Ardolf was encouraged to get some higher education. Together the young couple developed a plan for Mr. Ardolf to obtain a 2 year degree in electronics. With the backing of his wife, who worked full time in customer service, Mr. Ardolf finished his degree and obtained a job at Medtronics.  It could be said that his wife put Mr. Ardolf  through school, a phenomenon that was not popular with his in-laws, but which enabled the couple to get a start in life.

A notable characteristic of the couple was that they made major decisions collectively, one of which was that they would live a frugal life-style, paying off student loans as quickly as possible and putting money away to buy a house.

They bought that house in Brooklyn Park, getting a mortgage and continuing to work their jobs. After their oldest child was born in 1990, his wife went back to work in customer service, with their child in daycare. With the birth of their second child in 1992, the couple made the decision that it was time for the young mother to stay at home. In Mr. Ardolf's mind, theirs was a good marriage, decisions were made together, as a team.

Now as the only wage earner, Mr. Ardolf began what would be his new job duties for the next several years, travelling around the country servicing heart and lung machines. He would travel every other week, leaving Monday and coming home when the serving was done, anywhere from Thursday to Saturday. He travelled to every major city in the United States, to every state with the exception of Hawaii. He did this for about ten years and he was good at it. A mistake with a machine such as the ones he was servicing would have led to a death. There were no such incidents.

His third child was born during the travelling years. Once the children had reached school age, the couple decided that it was time for father to stop the travelling and spend more time at home. Medtronic, disappointed in the decision, did allow Mr. Ardolf to transfer to another department where he again serviced machines, this time diagnostic machines at the Medtronic site.

For the family, these were good times. They could not have been better.  Mr. Ardolf had a good job he liked, worked 8-5 hours, Monday through Friday, and most importantly did not have to travel. The couple had three happy, healthy children.

The couple celebrated their fifteenth wedding anniversary, still living in Brooklyn Park. Mr. Ardolf is convinced that theirs was a marriage that would have lasted forever, that they would have had thirty and forty years anniversaries.

Two days before his wife's 39th birthday, November 6, 2000, she died suddenly at home. That morning the power had gone out of the house. As Mr. Ardolf was driving to work, he noticed some of the houses had power. When he got to work, he called home to check on the power. The oldest daughter answered the phone and when asked where her mother was, said, "she's sleeping on the bathroom floor".

Mr. Ardolf kept his daughter on the phone and quickly borrowed a cell phone to call 911. He stayed on both phones until help arrived at home. On their arrival, the para-medics told

him to come home at once. Attempts to revive his wife were unsuccessful and she died in the family house shortly after Mr. Ardolf arrived.

From that date in 2000 until the day of his incarceration, July 9, 2010, did his best to raise his children on his own. He continued to work at Medtronic, with his free time he was at home. He didn't go out with women, play golf, go to bars, or socialize to any great extent. He did save as much money as he could.

In summer of 2008, Mr. Ardolf sold the Brooklyn Park home, the mortgage on which had been paid off. With that money, and with life insurance money, he bought the house in Blaine, moving in shortly before his neighbors.

On Saturday, August 2, 2010, Mr. Ardolf and his children celebrated a house warming party at the new house. He sent out invitations to friends and family. It was while entertaining his friends and family that the incident with the neighbor boy took.

Mr. Ardolf objects to the characterization of the incident as contained in the PSR and asserts that he did nothing inappropriate to the young neighbor boy. He also objects to the characterization contained in the PSR concerning his encounter with the neighbor on the following day. What is more important, however, and what has brought him before this Court for sentencing, was his criminal response to the incidents.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

As an opening, cautionary, statement, Mr. Ardolf emphasizes that the following is not intended to be interpreted as an attempt to blame his neighbors, justify his actions, or minimize his iniquitous actions. However, the enigmatic question which baffles is why did someone, with no criminal past, with a steady job, the sole parent to three healthy children, commit these bizarre criminal acts.

In the summer of 2008, his older daughter has just graduated from high school. His middle child was in high school and youngest about to go from junior high to senior high. The move to the Blaine house was made to provide a bigger and newer house for his children in what was understood to be a better neighborhood. The move to the new neighborhood was significant to Mr. Ardolf.

Following the August incident with the neighbors, Mr. Ardolf felt that he was being unfairly labeled in the neighborhood. He felt he was being shunned for something he did not do.

20

Unable to develop a different coping strategy, he snapped.

Mr. Ardolf did not set out with the purpose of sending the multiple e-mails that he eventually did send. He did want revenge, and he did intend to harm his neighbors. What he would like the Court to consider, however, is that he did not realize that his efforts at sending the e-mails had been successful. He was unaware that he had gotten through the computer network filters with his e-mails. In his mind, he believed that once the first  of his vicious e-mails had actually reached its target, that the security of the  wireless router encryption would be increased, or that the law firm computer filter would stop future similar e-mails.  It was not until confronted by law enforcement, did he realize that the e-mails had been received.

The pernicious nature of the e-mails sent by Mr. Ardolf  is beyond question. The above text is meant as no justification for them. The reason that so many were sent, however, is that he did not know that he had reached his intended target with his first attempt, so he repeated the attempts.

## DAP

Although Mr. Ardolf himself minimized his alcohol use to the U.S. probation officer, other sources, ranging from child protection to family members, report the whisky was Mr. Ardolf's drug of choice and that he drank hard liquor, particularly whiskey, in the area of three times a week, certainly as a result of stress of being a single parent to three teenage children.  Mr. Ardolf should address this issue during his period of incarceration by participating in the Bureau of Prison's DAP program.

## SUMMARY

What do we say to the world about Mr. Ardolf's  behavior? What message needs to be sent to deter such behavior, not only on the part of Mr. Ardolf, but to anyone even considering the commission of similar type of acts?

The clear answer is that there should be a clear message that such behavior will be treated very seriously. What is the sentence that is sufficient, but not greater than necessary, to send that message?

Mr. Ardolf believes that the sentencing guidelines are the compass for the Court and that the above guideline analysis results in a reasonable sentence for him; one that not only provides a

fair punishment for him, but also signals to society at large that the type of conduct involved here will be met with serious, but also fair, consequences.

A sentence which is sufficient, but not greater than necessary should be measured by the statutory goals of 18 U.S.C. 3353, oriented by the sentencing guidelines. A fair calculation of the sentencing guidelines produces a sentence of incarceration of 63 to 78 month, a reasonable sentence for a man with no prior criminal record, a man embarrassed by his own actions, who has destroyed his own life and knows that he has caused incredible pain to those around him, both his neighbors and his own children.  He finally wishes to reaffirm his sincere apology to the neighbors, to his children, his other family members and to the Court. He was not brought up to act as he did.

Respectfully submitted,                              s/Kevin M. O'Brien
                                                     Kevin M. O'Brien #80561
                                                     Stand-by counsel for Barry Ardolf
                                                     247 Third Avenue South
                                                     Minneapolis, Mn, 55415

## DEFENDANT'S ACCEPTANCE OF RESPONSIBILITY STATEMENT

United States v. Barry Vincent Ardolf
Criminal No: 10-159 (DWF)

I cyber-attacked my neighbor Mathew Kostolnik. What I did was wrong, despicable, and without justification. I apologize to the Kostolnik family and want them to know that I will never attempt any such acts again.

It is clear that my actions were motivated by the events of August 2008. I had perceived Mr. Kostolnik to have made a mistaken and humiliating allegation against me. I want to clearly state and acknowledge that his actions in no way justify what I did. When the effect and the consequences of my actions became real to me, I was so overwhelmed with shame that I simply did not want to accept what I had done. I wanted to deny it even to myself.

In July of 2008, I bought a new beautiful upgraded house in an area where the neighbors were friendly and kept their properties well groomed and maintained. This was the second home I had ever owned and I expected it to be the home that I retired to.

I held my house warming party two weeks after I moved into the new house. All of my family and friends came for the afternoon and evening. Mid-afternoon, a small child appeared on my deck. He kept running up and down the deck stairs, stopping each time he reached the top to look at me. He would smile, and run away again. At first I thought that he must have come with one of the guests, and I went outside to ask if the boy was with any them. When I was outside I saw a pregnant lady with an infant in her arms who was calling for the boy to come to her. I walked away from my guests and approached her.

We introduced ourselves and I offered my assistance in getting the boy to go with her. I tried to coax the boy to run back to their yard by having him chase me as I led him back. Eventually I got him back to his front door. As I turned to leave, the boy then reached out his arms to give me a hug and an "air-kiss" on my cheek. To me, this was a good-natured, neighborly encounter.

The next day, Mr. Kostolnik came into my yard while I was outside and accused me of being inappropriate with his son. He was upset and demanded that I never go on his property, never to talk to him, his wife, or any of his children under any circumstances. I felt powerless, humiliated, and victimized.

That summer, neighbors who had previously invited me to dinner shunned me. I blamed Mr. Kostolnik for destroying my dreams for my new neighborhood. I decided to "get even" by launching computer attacks against him.

I learned that these attacks were effective when the authorities came to my house with the search warrant. At first I was so horrified and embarrassed by the ugliness of my actions that I simply could not admit them to anyone. At trial, I was confronted with the reality of the pain and harm I had caused the Kostolniks and my family and friends. Following the trial, I relapsed into a period of denial, unable to accept that I had really done these unspeakable acts.

With the help of a priest, I came to realize that I could not continue to lie to everyone and that I had to admit to my horrible acts and accept the consequences for them.

I do not offer this explanation of my motives and reasoning as an excuse, for there is none. I believe that the hurt and disappointments in my life, particularly the sudden and unexpected death of my wife, have left me fragile and embittered. I have thought to myself that if my wife had been alive, she would have gone over and straightened things out with the Kostolniks. However, I am a grown man and I should have acted like one and figured out an honest and straight-forward way to deal with the situation and not hide behind the anonymity of my computer to get back at him.

I recognize that I have humiliated Mr. Kostolnik personally, frightened his family and embarrassed him professionally. I have let down and destroyed my family. I am leaving my children with no parent. I have lost my profession and my freedom. If I could take it all back, I would. However, I can do nothing more than acknowledge the wrongfulness of my actions, and ask forgiveness from my victims and community. I ask God to show me a purpose and a way forward with my life.

I am truly sorry for what I have done.


Barry Vincent Ardolf